**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UMOJA ERECTORS, LLC,** | : | |
| *Plaintiff* | : | **CIVIL ACTION** |
| **v.** | : | |
| **D.A. NOLT, INC. and NORTH AMERICAN SPECIALTY INSURANCE COMPANT** | : | **No. 20-5046** |
| *Defendants* | : | |

**MEMORANDUM**

PRATTER, J. FEBRUARY 15, 2024

On August 18, 2015, the City of Philadelphia awarded D.A. Nolt the general construction contract for the restoration of a large, dilapidated building at 4601 Market Street, which was meant to become the city's Public Safety Services Campus (the "PSSC"). D.A. Nolt subsequently entered into a subcontract ("the Subcontract") with Umoja Erectors, LLC ("Umoja") for the restoration, under which Umoja was to provide "all labor, materials and equipment required for the supply, fabrication, erection, layout, coordination and installation of all the steel, framing, screen wall, bracing, ladders, grating/stairs, fall protection anchors, and all related miscellaneous components and hardware required for the installation of complete systems." Although Umoja received the subcontract in June 2016, Alburn Brown, the president of Umoja, did not sign the contract until November 2016. In the intervening five months, Umoja negotiated a subcontract with RCC Fabricators, a steel fabricator.

The project was plagued with problems, and much of the work done by Umoja was reworked or replaced. Umoja would frequently identify errors in steel after the steel had been delivered to the construction site, hoisted via crane, brought into the building through a window,

and then lifted into place. Problems with dimensions could sometimes be corrected in the field, while at other times, Umoja would have to send the steel back to the steel fabricator. In December 2016, the City determined through inspections that the steel work was 90% complete, but it took Umoja until March of 2017 to finally complete the work due to all the corrections and reinstalments. Frustrated by the delay, D.A. Nolt advised Umoja that it was not going to pay Umoja for time and material for corrections or rework, and that no work performed by Umoja after January 16, 2017, the date on which the project was supposed to be completed, would be compensated.

In February 2017, D.A. Nolt issued a partial payment to Umoja for the $30,000 coordination fee and a joint check to be negotiated between Umoja and RCC. Umoja never paid RCC out of the issued joint check, leading to a lawsuit between RCC and D.A. Nolt's bonding company. In total, the City paid D.A. Nolt $476,550.70 for steel work completed through December 16, 2016. By the end of February 2017, D.A. Nolt had paid out approximately $19,000 more for steelwork than it had received from the City. In August of 2022, the City paid D.A. Nolt its contract balance, which D.A. Nolt used to pay RCC in exchange for a release. D.A. Nolt also paid Umoja $26,375.52, which was Umoja's portion of the funds received from the City.

The Court presided over a four-day bench trial, and later reviewed the parties' proposed findings of fact and conclusions of law. Upon consideration of these proceedings, filings, and the evidence presented, the Court concludes:

(1) Umoja and D.A. Nolt entered into a fully integrated Subcontract.

(2) Under the Subcontract, D.A. Nolt has no duty to pay for time and material costs incurred to correct or repair non-conforming or rejected steel work.

(3) Umoja has not met its burden to prove with reasonable certainty damages owed for steel erection-related charges but has done so with regard to the unpaid coordination fee.

(4) D.A. Nolt did not violate the Subcontract's payment terms or the Prompt Payment Act by withholding payments.

(5) D.A. Nolt is entitled to a defensive recoupment in excess of any of Umoja's nonspeculative damages, so Umoja cannot recover.

## FINDINGS OF FACT

### I. The Parties

1. In or about 2012, the City of Philadelphia publicly announced its decision to relocate the police headquarters from its location at 750 Race Street, Philadelphia, PA 19106. Doc. No. 50 ¶ 1.

2. On or about March 8, 2012, Mayor Michael Nutter announced the City's plan to renovate a building located at 4601 Market Street in Philadelphia, PA. *Id.* ¶2. Once renovations were complete, the building would be known as the Public Safety Services Campus, and would house the police headquarters, medical examiner's office and morgue, and laboratory services for the Department of Public Health. *Id.* ¶¶ 3-4.

3. On August 18, 2015, the City awarded D.A. Nolt the general construction prime contract for this project in the amount of $13,473,817.02 (the "Contract"). *Id.* ¶ 7. Mr. Rich O'Brien is the vice president of D.A. Nolt and acted as the project executive/manger on the renovation project. Trial Tr. 28:12-22, January 31, 2023 ("TD2"). Chuck Knauff, D.A. Nolt's Project Manager, worked onsite on the renovation almost every day from October 2015 through June 2017. Trial Tr. 56:17-57:2, February 1, 2023 ("TD3").

4. Umoja is a steel erector and has been in business for approximately 15 years. January 30, 2023 ("TD1") Trial Tr. 45:6-8. Alburn Brown is the president of Umoja. TD1, 44:21.

His responsibilities as to this renovation were not field-related, but included estimating, scheduling, contracting, and coordination.. TD1, 45:18-23. Mr. Brown testified that he did not have first-hand information on any issues with the steel and deferred to his project superintendent, Kevin Lumpkin. TD1, 67:2-5; 103:12-18; 111:15-23.

5. D.A. Nolt entered into a Subcontract with Umoja to provide "all labor, materials and equipment required for the supply, fabrication, erection, layout, coordination, and installation of all steel, framing, screen wall, bracing, ladders, grating/stairs, fall protection anchors, and all related miscellaneous components and hardware required for the installation of complete systems." Doc. No. 50 ¶8.

6. Umoja subcontracted the steel fabrication to RCC Fabricators. TD2, 29:5-6.

## II. The Subcontract Required Umoja to Perform Fabrication and Erection in Accordance with the Project Plans and Specifications

7. In June 2016, Umoja received the Subcontract from D.A. Nolt for its work on the renovation. TD1, 77:24-78:8; Pl.'s Ex. 1, at 1-26, Doc. No. 53 ("P-1"). Mr. Brown did not sign the Subcontract until November 2016. He testified that during those months, he had legal counsel review the Subcontract. TD1, 78:9-17. During those five months, Umoja negotiated a subcontract with RCC for steel fabrication. TD1, 78:18-20. Mr. O'Brien did not participate in the negotiation between Umoja and RCC over the terms of that subcontract. TD2, 29:7-10. Umoja and RCC eventually entered into a written subcontract ("RCC Agreement"). Def.'s Ex. 51 ("D-51").

8. Article 3 of the Subcontract between Umoja and D.A. Nolt contains an integration clause. P-1, Art. 3. Mr. Brown understood that the Subcontract was a final agreement, and that any changes to that agreement could only be made in writing. TD1, 88:17-89:6.

9. The Subcontract required Umoja to "diligently and fully perform and complete those portions of work" described in Exhibit A to the Subcontract. TD1, 79:10-17; P-1, Ex. A ¶ 1.

10. For the work described in Exhibit A to the Subcontract, Umoja was also required to provide "all necessary management, supervision, labor, material, tools, supplies, equipment, plant, services, sundries, appurtenances, [and] engineering ...." TD1, 80:14-19; P-1, Ex. A ¶ 1.

11. According to Exhibit A to the Subcontract, Umoja's scope of work included the "labor, materials and equipment required for the fabrication [and] erection" of steel. TD1, 81:1-9; Doc. No. 5 ¶ 8; P-1, Ex. A ¶ 1.a.

12. Exhibit A to the Subcontract also required Umoja to perform the layout for all structural steel and to erect the steel. TD1, 81:10-19; P-1, Ex. A ¶ 1.a.

13. The structural steel within Umoja's scope of work included steel on the fifth floor to support fall protection, steel on the fifth floor to support mechanical equipment, steel on the roof in the penthouse for a future elevator, and screen wall steel on the roof. TD1, 81:20-83:8. Mr. Brown agreed that the Subcontract required Umoja to provide all labor, material, and equipment necessary to fabricate the steel for all these areas. TD1, 83:16-25.

14. Under Section E of Exhibit A to the Subcontract, Umoja was also obligated to coordinate inspection and approval of its work by the steel inspector, Pennoni Associates ("Pennoni"). TD2, 66:17-67:24; TD3, 70:6-15; P-1, Ex. A ¶ 1.e.

15. D.A. Nolt agreed to pay Umoja a lump sum fee of $30,000 to coordinate the fabrication to erection process. TD1, 84:9-22.

16. The City of Philadelphia's Project Manual, which Mr. Brown had reviewed, was incorporated by reference into the Subcontract. P-1, Ex. A ¶ 1.j; TD1, 86:2-4. The City of Philadelphia Standard Contract Requirements ("SCRs") were also incorporated into the Subcontract as a Contract Document in Exhibit B to the Subcontract. P-1, Ex. B ¶ 4.

17. Mr. Brown admitted that the Subcontract incorporated both the City's Project Manual and the SCRs. TD1, 86:25-87:8; *see also* P-1, Ex. B ¶¶ 1, 4.

18. Section 63 of the SCRs provides, in relevant part, that the "materials used in the work under the [Subcontract] shall conform to the requirements of the Plans, Technical Specifications and Standard Details and Specifications[.]" Def.'s Ex. 1 ¶ 63, Doc. No. 55 ("D-1").

19. Section 66 of the SCRs states, in relevant part, that the contractor "shall remove, at its own expense, any work or material rejected by the Project Manager as unsuitable, unfit, or otherwise defective and not in accordance with the Contract Documents, and shall repair, replace or reconstruct the same without additional compensation." D-1 ¶ 66.

20. Per the terms of Sections 63 and 66 of the SCRs, Umoja was required under the Subcontract to remove any material or work that did not conform to the specifications of the contract documents and replace that material or work. D-1 ¶ 63, 66; TD2, 30:21-31:6.

21. Mr. Brown admitted that if Umoja provided steel that did not conform with the specifications of the contract documents, Umoja was required to remove and replace any nonconforming piece. TD1, 87:14-88:14.

**III. Umoja Was Responsible for Field Measurements**

22. Under the terms of the Subcontract, Umoja was also responsible for layout and verification of field dimensions prior to fabrication. TD1, 83:18-84:6; P-1, Ex. A ¶ 1.c.

23. To verify field dimensions, Umoja and RCC prepared erection drawings that were approved by the Project engineer. Umoja then had to physically measure where the steel members would attach. Trial Tr. 40:12-41:20, February 3, 2023 ("TD4").

24. If Umoja believed that something interfered with its ability to obtain accurate measurements, Umoja would notify D.A. Nolt. TD1, 104:19-106:22.

25. Umoja completed the field measuring on the site over several days. TD3, 58:12-16.

26. Mr. Knauff, D.A. Nolt's Project Manager, communicated with Umoja about the sequencing of various events and actions taking place on the site, such as the timing of the removal of a slab on the roof. TD4, 39:19-40:7.

27. Umoja has provided no clear evidence that it advised D.A. Nolt of any obstruction of or interference with the measuring process. TD2, 65:10-19.

28. Mr. Knauff testified that during the time in which Umoja was conducting measurements, Umoja never advised of areas on the site requiring demolishing to enable Umoja to complete the measurements. TD3, 58:17-20; TD4, 43:21-44:13.

29. Umoja has presented no contemporaneous evidence of any communications, written or oral, with D.A. Nolt about measurements it could not soundly or accurately take. *See* TD4, 39:2-17; 65:10-14; TD1, 139:18-140:14. To the contrary, in September 2016, Mr. Brown emailed RCC to advise that Mr. Lumpkin had confirmed the measurements without any issues related to inaccessible areas. Def.'s Ex. 12, 1, Doc. No. 55 ("D-12"); TD1, 139:18-140:14.

30. Umoja and D.A. Nolt's testimony that, as a matter of practice, they would not proceed with steel fabrication without sure measurements, combined with the lack of any contemporaneous evidence of complaints about inaccessibility during the field verification process is compelling evidence that Umoja never advised D.A. Nolt of any obstructions or impediments preventing accurate field verification. D.A. Nolt was not the cause of any field measurement errors made by Umoja.

## IV. Much of the Steel Supplied and Erected by Umoja Had to be Removed and Replaced or Corrected

31. Many items of steel supplied and erected by Umoja had to be reworked or replaced because of a myriad of issues, including: installations completed incorrectly, steel that was too

long or too short, rejected welds, steel that was installed in the wrong place, and other issues identified by various inspectors. TD2, 33:2-18. These issues led to "corrective work that was required to address the issues and problems within the scope that Umoja was responsible for; it would have included repairing deficient welds in the field, replacing incorrectly fabricated or installed steel . . . and the replacement or the corrected steel; [and] it would have involved steel that was installed in the wrong locations." TD3, 4:3-16.

32. Mr. Knauff testified that "90 percent of the work that [Umoja] performed was either incorrect or not in compliance." TD3, 88:14-19. He also stated that he had not witnessed such extensive corrective work on any other project in his decades-long career. TD3, 88:20-23. The corrective work occurred on "pretty much the entire project," including on the large beams on the fifth floor, the fall protection davits, and the screen wall. TD3, 62:3-19.

33. Pennoni was responsible for inspecting the steel and rejected many items. TD2, 33:25-34:2. Sometimes Umoja itself identified errors, but often those errors were not uncovered until the steel had already been offloaded, hoisted into the air, brought into the building by a crane, and lifted into place—only then did it become apparent that the pieces were too big or too small. TD2, 33:19-24; TD3, 60:4-12; TD3, 89:1-6; TD4, 42:23-43:13. Some steel pieces were corrected onsite, while others had to be corrected by RCC at its factory. TD3, 60:13-61:7; TD1, 61:16-19.

34. Umoja also made welding errors that resulted in the improper welds being cut out and redone. TD3, 61:5-62:2.

35. In December 2016, the City determined that the steel work was 90% complete. It took Umoja until March of 2017 to complete its work due to the extensive corrections and reinstallations. TD2, 57:20-58:10.

36. In December 2016, Umoja sent a series of emails detailing significant corrective replacement work on the penthouse steel, fifth floor steel, and screen wall steel, including information about how long it took to rework those items. Pl.'s Ex. 4, at 1 ("P-4"); Pl.'s Ex. 5, at 1-3 ("P-5"); and Pl.'s Ex. 6 ("P-6").

37. In January 2017, D.A. Nolt was forced to install a temporary roof because the steel work was still ongoing. *See* Def.'s Ex. 27, at 1-4 ("D-27"); TD1, 138:10-139:17.

38. Many these issues were caused by Umoja's failure to properly manage and coordinate the steel, as it had agreed to do in the Subcontract in exchange for a premium payment of $30,000. TD2, 37:8-13.

## V. Third-Party Inspection Reports Provide Independent Corroborating Evidence of Umoja's Errors and Efforts to Correct or Redo Incorrect Steel After January 16, 2017

39. Pennoni, the third-party steel inspector, prepared field reports for the steel work. TD3, 71:13-18; *see, e.g.*, Def.'s Ex. 38, at 1 ("D-38").

40. Each of these field reports were numbered and included the project, date of site visit, the technician's name, the engineer, architect, the contractor's/contractors' name(s), and a description of the weather. TD3, 71:19-72:7; *see, e.g.*, D-38 at 1. D.A. Nolt received these reports throughout the renovation work and submitted them to the City's Construction Manager and to Umoja for review. TD3, 72:8-18. Per the Pennoni reports, Umoja's corrective and repair work continued through March 2017. *See, e.g.*, D-38, Report. No. 37; TD3, 85:19-25. Umoja never contested the accuracy of the Pennoni reports. TD4, 52:1-4.

41. Based on the testimony of Mr. Brown, Umoja invoiced D.A. Nolt for all erection work, even repair and corrective work required by errors in fabrication. TD1, 103:19-104:11; 113:6-11.

## CONCLUSIONS OF LAW

1. Sitting in diversity, this Court predicts how the Pennsylvania Supreme Court would rule. *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 356 (3d Cir. 2020). To prevail, Umoja must show by a preponderance of the evidence that (1) Umoja and D.A. Nolt had a contract, (2) D.A. Nolt breached that contract, and (3) Umoja experienced damages from the breach. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

### I. The Parties Entered Into a Fully Integrated Subcontract

2. The Subcontract was fully integrated, thereby precluding any consideration of parol evidence of prior negotiations and agreements regarding the same subject matter covered by the contract. S*ee Bonilla v. City of Allentown*, 359 F. Supp. 3d 281, 298 n.18 (E.D. Pa. 2019) ("Once a writing is determined to be the parties' entire contract, the parol evidence rule applies and evidence of any previous oral or written negotiations or agreements involving the same subject matter as the contract is almost always inadmissible to explain or vary the terms of the contract." (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436-37 (2004))).

3. A writing, like a contract, is integrated where it "appears to be a contract complete within itself" and imports a legal obligation without uncertainty as to the extent of that agreement. *Marano v. Fulton Bank, N.A.*, No. 812 MDA 2016, 2017 WL 1242793, at *3 (Pa. Super. Ct. Apr. 4, 2017).

4. The inclusion of an integration clause is a clear signal that the parties intended the writing to constitute an entire agreement. *Am. Diabetes Ass'n v. Friskney Fam. Tr., LLC*, 177 F. Supp. 3d 855, 872 (E.D. Pa. 2016). The Subcontract at issue here contains such a clause: "This Subcontract constitutes the entire agreement between the parties and supersedes all proposals,

correspondence, and oral agreements between the Subcontractor and Contractor if any." P-1 ¶ 3.1. The Court therefore concludes that D.A. Nolt and Umoja entered into a fully integrated subcontract.

5. Because the Subcontract is fully integrated, "the parol evidence rule [is] clearly applicable." *Mellon Bank Corp. v. First Union Real Est. Equity & Mortg. Invs.*, 951 F.2d 1399, 1406 n.6 (3d Cir. 1991); *see McGuire v. Schneider, Inc.*, 534 A.2d 115, 117 (1987), *aff'd*, 548 A.2d 1223 (1988) ("Where the parties to an agreement adopt a writing as the final and complete expression of their agreement . . . evidence of negotiations leading to the formation of the agreement is inadmissible to show an intent at variance with the language of the written agreement."). Therefore, any prior agreements, statements, or understandings that Umoja or D.A. Nolt had that would "alter, vary, modify, or contradict" the language of the Subcontract are not considered. *See Kehr Packages, Inc. v. Fid. Bank, Nat. Ass'n*, 710 A.2d 1169, 1172 (Pa. Super. Ct. 1998).

## II. D.A. Nolt Has No Duty to Pay for Time and Material Costs Incurred to Correct or Repair Non-Conforming or Rejected Work

6. "When a written contract is clear and unequivocal, its meaning must be determined by its contents alone." *Melon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1010 (3d Cir. 1980) (quotation omitted). A contract is ambiguous if it is reasonably susceptible to different constructions and capable of being understood in more than one sense. *St. Paul Fire & Marine Ins. Co. v.* Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991). Under Pennsylvania law, ambiguous contracts are interpreted by the trier of fact, and unambiguous contracts are interpreted by the court as a matter of law. *Mellon Bank*, 619 F.2d at 1011 n.10.

7. The parties' fully integrated Subcontract required Umoja to "diligently and fully perform the positions of work" described in Exhibit A, titled "The Work," to the Subcontract. TD1,

79:10-17; P-1. Ex. A ¶ 1. The scope of work described in Exhibit A to the Subcontract explicitly included the "labor, materials, and equipment" for the fabrication and erection of steel. TD1, 81:1-9; Uncont. Fact ¶ 8; P-1, Ex. A ¶ 1.a. For all scopes of work described in Exhibit A to the Subcontract, Umoja was required to provide all necessary "management, supervision, labor, material, tools, supplies, equipment, plant, services, sundries, [and] engineering . . . ." TD1, 80:14-19; P-1, Ex. A ¶ 1. Umoja was also required by the Subcontract to coordinate the inspection and approval of its work by the steel inspect, Pennoni. TD2, 66:17-67:25; TD3, 70:6-15. These agreed-upon specifications render Umoja's obligations under the Subcontract unambiguous.

8. Additionally, the City of Philadelphia's Standard Contract Requirements were incorporated into the Subcontract as a Contract Document in Exhibit B to the Subcontract. P-1, Ex. B ¶ 4; TD1, 86:5-19. Section 63 of these standard contract requirements, in relevant part, states that the "materials used in the work under the Contract shall conform to the requirements of the Plans, Technical Specifications and Standard Details and Specifications[.]" D-1 ¶ 63. Section 66 of these standard contract requirements states, in relevant part, that Umoja "shall remove, at its own expense, any work or material rejected by the Project Manager as unsuitable, unfit, or otherwise defective and not in accordance with the Contract Documents, and shall repair, replace or reconstruct the same with additional compensation." D-1 ¶ 66. Therefore, the fully incorporated Subcontract unambiguously required Umoja to, at its own expense, remove any material or work that did not conform to the contract documents, including the plans and specifications therein, and replace it. D-1 ¶¶ 63-66; TD2, 30:21-31:6.

9. The Court concludes that, pursuant to the fully incorporated Subcontract, Umoja was obligated to diligently and fully complete the work described in Exhibit A of the Subcontract. That work, and the materials used in that work, had to comply with the plans and technical

specifications for the project, and Umoja was required remove and replace at its own expense any work or materials that were unsuitable, unfit, or otherwise not in compliance with those plans and specifications. Thus, under the unambiguous terms of the fully incorporated Subcontract, D.A. Nolt has no duty to pay for time and material costs incurred to correct steel work that did not conform to its specifications or had been rejected. D.A. Nolt, as a matter of law, has no obligation to pay any charges or invoices for corrective, repair, or redone work.

**III. Umoja Cannot Recover for Unpaid Steel Erection-Related Charges**

10. "[A] party seeking damages for breach of contract must be able to prove such damages with reasonable certainty." *Logan v. Mirror Printing Co. of Altoona, Pa.*, 600 A.2d 225, 227 (Pa. Super. Ct. 1991) (citations and internal quotation marks omitted) (alteration in original). "At a minimum, reasonable certainty embraces a rough calculation that is not too speculative, vague, or contingent upon some unknown factor." *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 669 (3d Cir. 1998) (internal quotations marks omitted).

11. Because D.A. Nolt is not obligated to pay any charges or invoices for corrective, repair, or redone work, it did not breach the Subcontract when it failed to pay those charges or invoices. Therefore, Umoja can only recover for unpaid charges or invoices unrelated to correction, repairs, or reinstallations.

12. Umoja has only submitted as proof of unpaid erection-related charges invoices that do not distinguish between corrective work and noncorrective work. Umoja's invoices track only the hours worked, and do not adequately describe the nature of the work associated with the hours listed. *See, e.g.*, P-25 (including only "T&M Labor foreman const/hr 12/5/16 through 12/9/16" as the "Description" for an itemized charge"). The time sheets attached to the invoices list multiple scopes of work, do not allocate hours to each task listed, and do not separate out the various tasks

so as to delineate non-corrective work. In other words, Umoja has not proven with reasonable certainty that D.A. Nolt failed to pay any charges or invoices that were not for corrective, repair, or redone work. Moreover, D.A. Nolt has demonstrated that all invoices after January 16, 2017 were for corrective, repair, or redone work. *See* Def.'s Ex. 44, at 3 ("D-44"); *see also* TD1, 125:1-126:1; TD2, 64:25-65:4. The Court concludes that Umoja has not proven its damages as to the unpaid erection-related charges with reasonable certainty.

13. Because Umoja cannot meet its burden of proof with respect to the erection-related charges, the only remaining potentially recoverable sum is the unpaid portion of the $30,000 coordination fee, which amounts to $20,737.50. For the reasons provided below, however, the Court concludes that Umoja cannot recover the outstanding $20,737.50 because D.A. Nolt is entitled to a full defensive recoupment of those damages.

## IV. D.A. Nolt Did Not Violate the Subcontract's Terms or the Prompt Payment Act

14. The Prompt Payment Act applies to "contracts between a government agency . . . and a contractor." *E. Coast Paving & Sealcoating, Inc. v. N. Allegheny Sch. Dist.*, 111 A.3d 220, 232 (Pa. Commw. Ct. 2015). If a contractor withholds payment in bad faith, the Court has discretion to award 1% per month of the amount withheld in bad faith as a penalty. 62 Pa. Cons. Stat. § 3935(a).

15. Under the Subcontract, D.A. Nolt agreed to pay Umoja "partial payments . . . on the subcontractor pay estimate form in an amount equal to 95% (5% retainage) of the estimated value of work and materials incorporated into the Project . . . and paid to [D.A. Nolt] by Owner, less the aggregate of previous payments[.]" P-1 ¶ 4.1.1. However, Umoja agreed that "payment from the Owner to [D.A. Nolt] for [Umoja's] labor and materials is a condition precedent to payment from [D.A. Nolt] to [Umoja]. By entering into the Subcontract, [Umoja] agrees to bear

the risk of non-payment by the Owner." P-1 ¶ 4.1.2. And as for final payment: "final payment from the Owner to [D.A. Nolt] for [Umoja's] labor and materials is a condition precedent to payment from [D.A. Nolt] to [Umoja]. By entering into the Subcontract, [Umoja] agrees to bear the risk of non-payment by the Owner." P-1 ¶ 5.3.

16. "Pennsylvania law recognizes that pay-if-paid clauses present a condition precedent to payment[.]" *Quinn Constr., Inc. v. Skanska USA Bldg., Inc.*, 730 F. Supp. 2d 401, 421 (E.D. Pa. 2010) (citation omitted). Articles 4.1.2 and 5.3 of the Subcontract are enforceable "pay-if-paid" clauses because they unambiguously condition D.A. Nolt's obligation to pay Umoja on D.A. Nolt first receiving payment from the City of Philadelphia. *See LBL Skysystems (USA), Inc. v. APG-America, Inc.*, No. Cov.A. 02-5379, 2005 WL 2140240, at *32 (E.D. Pa. Aug. 31, 2005) ("A pay-if-paid condition generally requires words such as 'condition,' 'if and only if,' or 'unless and until' that convey the parties' intention that a payment to a subcontractor is contingent on the contractor's receipt of those funds.") (citing *Earthdata Int'l of N.C., L.L.C. v. STV Inc.*, 159 F. Supp. 2d 844, 847 (E.D. Pa. 2001)).

17. Additionally, pursuant to Section 4.5 of the Subcontract, "D.A. Nolt has no obligation to pay Umoja in the event of delays caused by Umoja or if deficient work is not timely and satisfactorily corrected by Umoja." Def.'s Ex. 29, at 1 ("D-29"); P-1 ¶ 4.5.

18. The City of Philadelphia's last payment to D.A. Nolt (prior to judgment being entered against the City and in favor of D.A. Nolt) was in February 2017—the City failed to make the next several payments. Def.'s Dem. Ex. 2, at 2, Doc. No. 56; TD2, 53:24-56:19. D.A. Nolt timely notified Umoja of all deficiencies and the reasons why any payments would be reduced and/or placed in escrow. *See* D-29; Def.'s Ex. 44, at 1-3 ("D-44"). Umoja did not respond to these notifications of deficiencies.

19. On March 31, 2017, D.A. Nolt advised Umoja that the City refused to issue any further payments to D.A. Nolt. D.A. Nolt also reissued its warning to Umoja that there were problems with the quality of Umoja's work and provided specific reasons for D.A. Nolt's rejection of numerous Umoja invoices. *See, e.g.*, D-44 at 1-3. Umoja did not respond.

20. By the end of February 2017, D.A. Nolt divested itself of all funds received from the City for the steelwork, ultimately paying out approximately $19,000 more than it had received. Def.'s Dem. Ex. 2, at 2, Doc. No. 56; Uncontested Facts ¶ 11, Doc. No. 50; Def.'s Ex. 34, at 1-2 ("D-34"); TD2, 58:11-61:22.

21. The Court concludes that D.A. Nolt was within its rights under the terms of the Subcontract to withhold progress payments to Umoja for steelwork and that it did not withhold any payments in bad faith. D.A. Nolt did not violate the Prompt Payment Act.

## V. D.A. Nolt is Entitled to a Defensive Recoupment in Excess of Any Non-Speculative Damages

22. "Recoupment is a common law, equitable doctrine that permits a defendant to assert a defensive claim aimed at reducing the amount of damages recoverable by a plaintiff." *United States v. Keystone Sanitation Co.*., 867 F. Supp. 275, 282 (M.D. Pa. 1994) (citing *Berger v. City of North Miami*, 820 F. Supp. 989, 991 (E.D. Va. 1993)). "A claim may be asserted by way of recoupment if the claim arises from the same contractual transaction as the plaintiff's claim and essentially functions as a defense to that claim." *Integra Bank/Pittsburgh v. Freeman*, 839 F. Supp. 326, 330 (E.D. Pa. 1993) (citing *Lee v. Schweiker*, 739 F.2d 870, 875-76 (3d Cir. 1984)).

23. Under the doctrine of recoupment, D.A. Nolt "is entitled to claim, by way of deduction, all just allowances or demands, accruing to [it] in respect of the same transaction that forms the ground of the action. This is not a set-off . . . in the strict sense, because it is not in the nature of a cross demand, but rather it lessens or defeats any recovery by the plaintiff." *Household*

*Consumer Disc. Co. v. Vespaziani*, 415 A.2d 689, 694 (Pa. 1980) (quoting *Pa. R. Co. v. Miller*, 124 F.2d 160, 162 (5th Cir. 1942)).

24. D.A. Nolt's defensive recoupments claim arises out of costs incurred as a direct result of Umoja's performance under the Subcontract. Likewise, Umoja's claim to recover the unpaid portion of the coordination fee arises under the Subcontract because the coordination fee at issue was provided for in the Subcontract. The Court concludes that because both Umoja's claim for recovery and D.A. Nolt's defensive recoupment claim arise from the same contract, they arise from the "same transaction."

25. Umoja is not entitled to recover the outstanding balance for the coordination services because D.A. Nolt's defensive recoupment claim far surpasses the $20,738 Umoja is allegedly owed. D.A. Nolt has submitted proof that it incurred no less than $131,863.56 in costs due to Umoja's consistent failure to correctly install the steel on the first installation attempt and the attendant corrective work. Def.'s Dem. 1, Doc. No 56 at 1; TD3, 62:20-63:7; 63:8-13; 64:3-9. More than 75% of those costs were specifically itemized and presented to Umoja in March of 2017, with no response or objection by Umoja. *See* D-44 at 1-3; TD2, 62:2-20; TD1, 125:1-3; TD3, 10:24-16:12, 17:11-18, 63:21-65:20, 69:7-70:5; TD4, 65:21-24; D.A. Nolt's overpayment to Umoja for corrected, repaired, or redone work alone is enough to defeat Umoja's claim for recovery. *See* D-44 at 1-3. Umoja provided no evidence to dispute D.A. Nolt's overpayment for corrections in this amount.

26. The Court concludes that D.A. Nolt is entitled to defensive recoupment in an amount exceeding Umoja's damages for the unpaid coordination fee. Therefore, to the extent D.A. Nolt breached the contract by not paying the full coordination fee, Umoja cannot recover any damages for that breach.

## CONCLUSION

For the foregoing reasons, the Court finds that no balance is owed to Umoja, and the Court enters judgment in favor of D.A. Nolt and against Umoja. An appropriate order follows.

**BY THE COURT:**

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**